OPINION The sole issue before us is whether the 15.76 acres of land sold by petitioner in 1964 constituted property held primarily for sale to customers in the ordinary course of petitioner’s trade or business so that the profit therefrom was taxable as ordinary income rather than as capital gain. 'Subchapter P, secs. 1201 et seq., I.R.C. 1954, provides for special treatment of gains received on the sale of capital assets. Section 1221 (1) excludes from the definition of a capital asset “property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.” In Malat v. Riddell, 383 U.S. 569, 572 (1966), the Supreme Court concluded with respect to this statutory provision: The purpose of the statutory provision with which we deal ⅛ to differentiate between the “profits and losses arising from the everyday operation of a business” on the one hand ⅜ * ⅜ [citation omitted] and “the realization of appreciation in value accrued over a substantial period of time” on the other. * * * [citation omitted.] A literal reading of the statute is consistent with this legislative purpose. We hold that, as used in § 1221(1), “primarily” means “of first importance” or “principally.” Our task here is to determine whether petitioners held the property involved “primarily” for sale to customers in the ordinary course of its business as that phrase is interpreted by the Supreme Court in the above quotation. This question is purely a factual question, the burden of proof being upon petitioner. Several factors have been enumerated by the courts for the determination of the question, some of which are: (1) The purpose for which the property was initially acquired; (2) the purpose for which the property was subsequently held; (3) the extent to which improvements, if any, were made to the property by the taxpayer; (4) the frequency, number, and continuity of sales; (5) the extent and nature of the transactions involved; (6) the ordinary business of the taxpayer; (7) the extent of advertising, promotion, or other active efforts used in soliciting buyers for the sale of the property; (8) the listing of property with brokers; and (9) the purpose for which the property was held at the time of sale. See James G. Hoover, 32 T.C. 618 (1959); Ralph J. Oace, 39 T.C. 743 (1963). None of the above factors are conclusive standing alone, but rather all of the factors taken as a whole govern. W. T. Thrift, Sr., 15 T.C. 366 (1950). In this case we are dealing with the sale of unimproved real estate. There is really little dispute about the underlying facts; only in the implications that can be drawn therefrom. Concededly, petitioner is in the real estate business, namely, the development of real estate for the construction of homes thereon. While this is one facet of the real estate business, it is more restricted than the general real estate business. Thus, we are not concerned here with the situation where the taxpayer is in the general real estate business and is attempting to get capital gains treatment on sales of real estate. See Municipal Bond Corp., 46 T.C. 219 (1966), affirmed in part and reversed in part 382 F. 2d 184 (C.A. 8, 1967). At the time petitioner acquired the property in early 1962 the indications are that it intended to subdivide the property and construct residential homes thereon for sale in the usual course of its business, although it may have had some idea at that time of leasing or selling a part of the property for commercial use. Despite the fact that petitioner’s charter permitted it to engage in the general real estate business, it had never done so and had never dealt with commercial property. It soon became apparent, however, that because of its location this property could not be most profitably used as residential property, and that a better and more profitable use of the property would be for commercial purposes, particularly if the property could be combined with the property owned by the Hunts and Kennastons lying between petitioner’s property and Gallatin Eoad. Petitioner thereupon decided to abandon its plans for subdividing the property for residential use and to hold it as an investment for eventual use as commercial property.[1] Not long after petitioner acquired the property in February 1962 petitioner was approached by Leon Beard, a real estate broker, who was looking for commercial property for Sears, Roebuck. Petitioner indicated a willingness to sell the property if the price was right. However, Sears would not buy the property until the location of the highway interchange was fixed, and consequently never seriously negotiated for the property. So far as we can determine from the record, petitioner made no overt efforts to sell the property at any time after it was acquired. While Beard may subsequently have made some efforts to interest prospective purchasers in the property, he was acting more in his own interests as a real estate broker than in behalf of petitioner. Wiggins, the eventual purchaser of the 15.76 acres, contacted petitioner in the summer of 1964 with an offer to buy the property; petitioner did not contact Wiggins. The uncontradicted evidence is that petitioner was financially able to hold on to the property as an investment and was prepared to do so. Respondent’s contention is that petitioner acquired the property with the intention of either developing it and selling it as residential property or of selling it as commercial property, either of which, he contends, would be holding it primarily for sale to customers in the ordinary course of its business. Had petitioner been in the general real estate business, the facts would come closer to supporting respondent’s contention. As we said in Municipal Bond Corp., supra at 229, where the taxpayer was in the general real estate business: WMle we recognize that a corporation may be an investor in real estate and entitled to capital gain on the profits realized on the sale of such investment property, * * * we find it difficult to understand how the profits realized on the sales of property by a corporation engaged solely in the above business [buying, holding, renting, and selling real estate] can be considered other than the “profits * * * arising from the everyday operation” of that business, unless the corporation can show by convincing evidence that its primary purpose for acquiring all of its properties, or its primary purpose in acquiring a specific parcel of real estate, was to derive income from the holding of such property rather than the sale thereof, and that the sale of such properties was mot inconsistent with that primary purpose. ⅜ * *[2] However, that reasoning does not apply here because petitioner was not in the general real estate business. Petitioner’s business was the construction of houses for residential purposes either on property owned and developed by petitioner or on property owned by others. This is the only transaction in which petitioner purchased a large tract of undeveloped real estate, held it for a period of time, and then sold it in bulk for commercial use. Petitioner 'had no customers for commercial property in the ordinary course of its business. At the time of the trial petitioner still owned, undeveloped, the remainder of the 28-acre tract. It is well established that a taxpayer in the real estate business may hold real estate as an investment, Randolph D. Rouse, 39 T.C. 70 (1962); Eline Realty Co., 35 T.C. 1 (1960); Charles E. Mieg, 32 T.C. 1314 (1959). The characterization of a particular property as one held for sale or investment must be determined from the facts in each case, aided by the use of the various factors mentioned above. Of the various factors mentioned above which the courts have considered in determining issues similar to the one before us, the facts support only one that would be favorable to respondent. We agree that petitioner originally acquired the property for sale to customers in the ordinary course of its business. However, while the purpose of acquisition is one factor to be considered, it is not -conclusive, for as we stated in Eline Realty Co., supra at 5: while the purpose for the acquisition must be given consideration, intent is subject to change, and the determining factor is the purpose for which the property is held at the time of sale. * * * [Citations omitted.] But the other factors mentioned, viewed in the light of all the evidence in this case, convince us that petitioner abandoned this purpose soon after it acquired the property and thereafter held the property as an investment. The only improvements made by petitioner were to extend waterlines out to the property and were made before petitioner decided to bold the property for investment — more than 2 years before it was sold. Petitioner has made only this one sale of this type property and this transaction was much larger than any other participated in by petitioner. Petitioner did not advertise the property itself,[3] nor did it list the property with brokers; and we have found as a fact that the property was being held as an investment at the time it was sold. We cannot conclude from the record before us that the profit realized by petitioner on this one isolated transaction represents “profits * * * arising from the everyday operation of a [petitioner’s] business.” Instead we believe the profit resulted from a change in the character of the property because of the approaching highways and represented “the realization of appreciation in value accrued over a substantial period of time” while petitioner held the property, Malat v. Riddell, supra. We think our conclusion is in accord with what we stated in Raymond Bauschard, 31 T.C. 910 (1959), to be the fundamental objective of the capital gains provisions; i.e., to grant preferential treatment to the gains realized from those transactions which are not the normal source of (petitioner’s) business income. We hold that petitioner has carried its burden of proving that it was not holding this property primarily for sale to customers in the ordinary course of its business and, therefore, properly reported the gain realized on the sale of the 15.76 acres to Wiggins in 1964 as long-term capital gain. Decision will he entered under Rule 50. We give little weight to tlie fact that in early 1964 petitioner submitted its subdivision plat to the planning commission for reapproval. Having once obtained approval it was wiser to continue approval until some other use of the property was found. 2 But see discussion of this approach in Court of Appeals- opinion, 382 P. 2d 184, 187. The flyers sent out by Beard after Sears decided not to buy the property were primarily for hds own business, as alluded to previously.